IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re:<br>ROBERT L. JACKSON,<br>Debtor, | Case No.: 14-3568-JCO<br>Chapter 13 |
| ROBERT L. JACKSON,<br>Plaintiff,<br><br>v.<br><br>FLAGSTAR, FSB,<br>Defendant. | Adv. No. 15-143-JCO |

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment as to Counts I & II of the Second Amended Complaint, and Responses thereto. (Docs. 56, 57, 65, 66). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the District Court's Standing Order of Reference dated August 25, 2015. This matter involves both core and non-core issues. However, the parties have consented to the entry of a final order by the Bankruptcy Court. *Wellness Intern. Network, Ltd. v. Sharif*, ___ U.S. ___, 135 S.Ct. 1932 (2015).

Procedural History

Plaintiff Robert L. Jackson filed this adversary proceeding on July 30, 2015. His Second Amended Complaint alleges seven causes of action. Only two of those causes of actions will be adjudicated herein, Counts I and II, violation of the automatic stay and violation of the Real Estate Settlement Procedures Act (RESPA), respectively, with the remaining causes of action

being deemed abandoned (Doc. 31). The parties unsuccessfully mediated the case, and at the close of mediation, requested that, in lieu of a trial on liability, that they be permitted to submit cross motions for summary judgment on liability only, and set a trial on damages once liability is determined. (Doc. 47). The Court granted the parties' request and it is ripe for review. (Doc. 48).

Facts[1]

Plaintiff Robert Jackson is a 58-year-old medical technologist. He holds a chemistry degree from Stillman College. Jackson lives in Thomasville and works at both the Grove Hill Memorial Hospital (full time) and the Choctaw General Hospital (part time). Mr. Jackson lives with his wife Karen and the two have been married since 2011. (Doc. 56 at 2-3).

On or about August 26, 2010, Mr. Jackson entered into a loan agreement with Royal United Mortgage, LLC. The loan is in the amount of $94,807, with a fixed interest rate of 4.75% and a 30-year term. Monthly Principal and interest payments are $494.56. The Note is secured by a Mortgage dated August 26, 2010, pursuant to which the Mr. Jackson conveyed to Mortgage Electronic Registration Systems, Inc., solely as nominee for Royal United and its successors and assigns, an interest in real property located at 124 Tomlinson Ter., Thomasville, Clark County, Alabama 36784-2923. (Doc. 57 at 2). On the date the first payment became due, Flagstar became the mortgage servicer.

---

[1] The facts set out in this Order are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. *Davis v. Bank of Am., N.A.*, 2014 WL 5090692, at *1 (N.D. Ala. Oct. 9, 2014). All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *Id. (citing Info. Sys. & Networks Corp. v. City of Atlanta,* 281 F.3d 1220, 1224 (11th Cir.2002)). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *Id. (citing Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir.1994)).

The loan was paid without incident until Mrs. Jackson had a stroke, acquired considerable medical bills and lost her job. The Jacksons struggled to keep their bills current, but by the beginning of 2014, Mr. Jackson was unable to make his regular monthly payment. Anticipating that he would continue to struggle with the mortgage payments, Mr. Jackson contacted Flagstar to discuss his repayment options.

When he spoke with Flagstar representatives, Jackson was encouraged to apply for a loan modification. Jackson discussed with Flagstar what information and documents were required. Sometime in January or February 2014, Mr. Jackson, with his wife's help, submitted a loan modification application, along with some supporting information for the application.

In early March of 2014, after receiving financial documentation from Mr. Jackson, Flagstar initiated a review of Mr. Jackson for potential loss mitigation workout options. (Doc. 57 at 3). In April of 2014, Flagstar sent Mr. Jackson several notices that some documentation was missing from his application, as well as a letter indicating that his loan was in default. (Doc. 57 at 3; Doc. 56 at 4). The letter indicating default also set out the loss mitigation options available to Mr. Jackson. Mr. Jackson provided the additional required documentation, and on May 21, 2014, Flagstar notified Mr. Jackson that his loss mitigation application was complete. (Doc. 57 at 3). Flagstar's letter stated that "[w]e may take up to thirty (30) days to evaluate your complete application and send you a written notice of our determination of your eligibility and offer for a foreclosure prevention alternative or loss mitigation option, if any." (Doc. 56 at 5). The letter also stated that Flagstar would not institute a foreclosure action until the following three events occurred: (1) Flagstar completes its evaluation of the application; (2) Flagstar sends Jackson a written evaluation notice of its determination as to the modification request; and (3) Jackson is allowed time to respond to the notice. (*Id.*).

In mid June, Mr. Jackson called Flagstar to inquire about the status of his application; he was told that his modification request was still in review and to allow more time for Flagstar to complete the process. Mr. Jackson was also told to call periodically to check on the status of the request, which he did. Each time he called Flagstar, Jackson was told that he was eligible for the modification and it was still under review. During this time, Mr. Jackson continued to send monthly payments to Flagstar. However, because Flagstar continued to consider the loan in default, it repeatedly rejected Jackson's payments and moved toward foreclosure.

In June and July, Flagstar sent Jackson a series of letters, five total, which provided Mr. Jackson with a "forbearance plan" allowing Mr. Jackson's account to "remain delinquent" as long as the terms of the forbearance plan were abided by. The existence and content of these letters is not in dispute by the parties. However, the legal effect of these letters is highly disputed. Mr. Jackson did not sign or agree to the terms of the forbearance plan provided for in the letters.

In August of 2014, while Mr. Jackson was still waiting for a decision on his loan modification request, Flagstar's foreclosure department referred the account to outside counsel to begin foreclosure. On August 29, 2014, Flagstar received an assignment of the mortgage, allowing Flagstar to foreclose in its own name. On September 15, 2014, a Notice of Acceleration and Notice of Foreclosure Sale was sent to Mr. Jackson by Flagstar's outside counsel advising the foreclosure sale was scheduled for December 10, 2014. (Doc. 57 at 4). Plaintiff was never informed by Flagstar that his loan modification request was denied. (Doc. 56 at 6).

With the foreclosure sale approaching, Mr. Jackson submitted another loss mitigation application to Flagstar on October 10, 2014. Mr. Jackson again received several notices that his

loss mitigation application was incomplete and he needed to provide additional documentation, which he did. Fearing that foreclosure would occur during the time that his loss mitigation application was pending, Mr. Jackson filed for Chapter 13 bankruptcy in this Court on October 31, 2014. Mr. Jackson's bankruptcy plan proposed to maintain his mortgage by making direct payments to Flagstar while the trustee made payments through the plan to cure the arrearage.[2]

On November 6, 2014, Flagstar sent a letter to Mr. Jackson acknowledging the bankruptcy. On November 14, 2014, Flagstar sent a letter to Mr. Jackson stating that his loss mitigation application was complete and being evaluated. (Doc. 57 at 5).

On December 17, 2014, Flagstar sent Mr. Jackson a letter, the content and existence of which are not in dispute, only the legal effect. At the top of the letter written in large, bold letters, is "Urgent- Needs your Immediate Attention!" (Doc. 56 at 7). The body of the letter states that Mr. Jackson's account was presently due with arrearages totaling $8,298.94. The letter also states that it is a formal agreement of trial plan arrangements previously made with Flagstar which require signature and payment within 14 days of receipt. The demand for signature and payment are written in bold and underlined. The letter threatens, also in bold, that failure to sign and pay will nullify the agreement. The letter concludes with the statement in all capital, bold letters that "TIME IS OF THE ESSENCE."

At the bottom of the last page is a disclaimer written in plain typeface:

> "This letter is part of Flagstar's debt collection process. All information obtained relating to this letter will be used for that purpose. However, if you are under the protection of the bankruptcy court or have been discharged as a result of a bankruptcy proceeding, this notice is given to you under a statutory or contractual requirement and for informational purposes and is not intended as an attempt to collect a debt or as an act to

---

[2] The arrearages consisted of the first monthly payment that Mr. Jackson missed due to his wife's medical and job situation, as well as all of the payments that Flagstar rejected while the loss mitigation application was pending.

> collect, assess, or recover all or any portion of the debt from you personally except as allowed by law."

Flagstar describes this December 17, 2014, correspondence as a "notice of the trial modification plan with a lower interest rate and reduced monthly payment." Mr. Jackson has described this correspondence as violating the automatic stay. This court will address the legal effects of this correspondence below.

Mr. Jackson's bankruptcy plan was confirmed by this Court on April 22, 2015. In accordance with the plan, Mr. Jackson made his direct monthly payments to Flagstar, and on May 20, 2015 (some fourteen months after initially applying for a loan modification and some seven months after he filed bankruptcy), Mr. Jackson's loan was approved for a permanent modification. Mr. Jackson did not execute the permanent loan modification presented in the closing package. The foreclosure sale did not occur and Mr. Jackson continues to reside in the property.

## CONCLUSIONS OF LAW

### Standard of Review

Motions for summary judgment are governed by FED. R. CIV. P. 56(a), as incorporated by FED. R. BANKR. P. 7056. Rule 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Conclusory allegations by either party, without specific supporting facts, have no probative value. *Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985).

The party seeking summary judgment is responsible for submitting evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "The [bankruptcy] court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in [its] favor." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993).

Count I: Violation of the Automatic Stay

Section 362(a) of the Bankruptcy Code operates as a stay against the commencement or continuation of a proceeding against a debtor that could have been commenced before the debtor filed bankruptcy. 11 U.S.C. § 362(a). Subsection (k) provides for actual and punitive damages, including costs and attorneys' fees, for any willful violation of the § 362(a) stay. "Claims under § 362(k) consist of three basic elements: the violation of the stay, the defendants' willfulness, and the plaintiff's injury." *In re Thomas,* 554 B.R. 512, 519 (Bankr. M.D. Ala. 2016). "Violations of the automatic stay are willful if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless of whether the violator specifically intended to violate the stay." *Id.* Thus, "[e]vidence of intent to violate the stay is not required." *Credit Nation Lending Servs., LLC v. Nettles,* 489 B.R. 239, 247 (Bankr. N.D. Ala. 2013). "Knowledge of the bankruptcy filing is the legal equivalent of knowledge of the stay." *Wagner v. Ivory,* 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987). Subjective beliefs or intent of the defendant are irrelevant. *Jove Eng'g, Inc. v. I.R.S.,* 92 F.3d 1539, 1555 (11th Cir. 1996).

As a fundamental protection of the Bankruptcy Code, the stay provides debtors with temporary breathing space from the circumstances that brought them to file bankruptcy to begin with. As such, the stay protects debtors "not from communication with creditors, but from the threat of immediate action by creditors, such as a foreclosure or a lawsuit." *Brown v. Penn. State Employees Credit Union,* 851 F.2d 81, 86 (3d Cir. 1988). While there are valid reasons to communicate information about a debt that is secured by a mortgage on residential real property, such communication must not overtly demand payment or have the effect of coercing payment from the debtor. *Thomas,* 554 B.R. at 519-20.

In the present case, the Court finds Flagstar's December 17th letter violated the stay. (Doc. 56-11). The letter demanded payment and had a coercive effect on Debtor. The Court will analyze the letter page by page.

At the top of the letter in large, bold print, is "**Urgent – Needs your Immediate Attention**!" The body of the letter states "[y]our account is presently due for the months of 2/1/2014 to 12/1/2014. The arrearage totals $8,298.94 which includes late charges and any credit for partial payments made." The letter further states that it is a "formal agreement outlining the trial plan arrangements previously made with Flagstar Bank." In the same paragraph, the letter states in underlined, bold and italic print that "*<u>it must be signed and returned to our office with funds within 14 days</u> of receipt, no later than 12/3/12014. Failure to do so will result in nullification of this agreement and any previous arrangements will be considered void and full reinstatement will be required.*" The next paragraph states that the account will be allowed to remain delinquent as long as the terms of this agreement are followed. In the same paragraph, it says, "[y]ou must make your first trial period payment by the first payment due date designated below. If you fail to make the first trial period payment by the first

8
Case 15-00143    Doc 68    Filed 03/23/17    Entered 03/23/17 12:30:32    Desc Main
Document    Page 8 of 18

payment due date and we do not receive the payment by the 15th day of the month in which it is due, this offer will be revoked and foreclosure proceedings may continue and a foreclosure sale may occur." The next sentence, in all caps and bold lettering says, "**TIME IS OF THE ESSENCE.** *Please contact our office no later than 12/31/2014 as we will continue your loss mitigation review.*" The next line of the letter is a freestanding sentence and its own paragraph. The line is in all caps, is underlined and in bold print: "**\*\*THE TRIAL PLAN WILL NOT BE PROCESSED WITHOUT THE FIRST MONTH'S PAYMENT\*\*.**" The letter then breaks down the next three month's worth of payments to be made by Debtor.

Turning to the second page, the first paragraph begins by setting out Flagstar's rights under the agreement if Debtor signs it. The second to last sentence states, "[i]t is also understood that if the undersigned breaches any of the terms, covenants, representations or warranties contained in the Mortgage and Note this agreement to forbear shall *without notice* be terminated." (emphasis in original). The next and last substantive paragraph, in bold and italicized print states,"*[t]he trial plan is broken or failed if the property becomes abandoned or vacated and if a payment is not made within 15 days of the trial plan due date. The agreement will be considered breached and foreclosure will immediately proceed without further notice.*" Flagstar's remittal address is then listed and a place for Debtor and Flagstar to sign is then provided.

The letter is an attempt to coerce the debtor to quickly act, making payments in accordance with this "agreement" or risk revocation of the agreement and foreclosure proceedings. On the first page only, there are at least three references to time and how it is running out if Mr. Jackson does not comply with the terms set out therein. On the second page, the multiple use of the tag, "without further notice" is an unambiguous emphasis on the

immediate consequences that Mr. Jackson will face if he does not comply with the letter. The letter also falsely states that Flagstar has a right to immediately foreclose if Jackson does not comply. Further, it expressly threatens the commencement of foreclosure without notice if Debtor does not comply with the terms set out in the letter. When read from the perspective of the least-sophisticated consumer,[3] references to urgency regarding the mortgage on a person's home, like this one, tend to incite action; action coerced from fear or threat of foreclosure. When Debtor initially began negotiating with Flagstar, he sought a permanent loan modification and was told over and over that he was being considered for such. For this letter to be sent to Debtor during this "in-limbo" period classifying its terms as an "agreement" of payment, would lead Debtor to only conclude that he *must act now,* as the letter requires, or risk immediate foreclosure. This letter is nothing like a regular monthly statement, escrow statement or payoff quote, and instead, it is everything like a collection letter violating the automatic stay.

Flagstar contends that this communication to Debtor is not violative of the stay because of the disclaimer at the end of the letter. The disclaimer states in whole,

> "[t]his letter is part of Flagstar's debt collection process. All information obtained relating to this letter will be used for that purpose. However, if you are under the protection of the bankruptcy court or have been discharged as a result of a bankruptcy proceeding, this notice is given to you under a statutory or contractual requirement and for informational

---

[3] In determining whether Flagstar's letter violates the stay, this Court believes it appropriate to apply, by analogy, the same standard utilized under the Fair Debt Collection Practices Act ("FDCPA"): the "least sophisticated consumer" standard. This standard reflects the policy that the FDCPA "protects all consumers, the gullible as well as the shrewd." *LeBlanc v. Unifund CCR Partners,* 601 F.3d 1185, 1194 (11th Cir. 2010). "The analogous 'least sophisticated consumer' standard under the FDCPA does not focus on the creditors' intent but instead on the natural consequences that may result from the communication." *In re Robinson*, 2011 WL 832857, at *4 (Bankr. E.D. Va. Mar. 3, 2011). Because the automatic stay, the discharge injunction and the FDCPA all seek to protect similarly situated individuals, this Court sees no reason why the least sophisticated consumer standard should not be extended to stay violations like this one. *See In re Campbell,* 553 B.R. 448, 455 (M.D. Ala. June 14, 2016).

> purposes and is not intended as an attempt to collect a debt or as an act to collect, assess, or recover all or any portion of the debt from you personally except as allowed by law."

The Court finds this three-sentence disclaimer underwhelming and insufficient to counter the demand for payment and coercive effect of the overall tone of the letter. Though this disclaimer is not in classically offensive "small print," its effect is no different. The least-sophisticated consumer would not read this two-page letter full of urgent and time-related threats of foreclosure and demands for payment coupled with repetitive use of the words, "must," "shall,'' "foreclosure will immediately proceed," and "without notice," and conclude that they did not have to act in accordance with terms set out in the letter because the disclaimer said so. The disclaimer does not even really say that; instead it uses the phrases, "statutory or contractual requirement" and states affirmatively that the letter is an attempt to collect the subject debt from the reader personally "as allowed by law" if the reader has, in fact, filed for bankruptcy.

While this Court recognizes that disclaimers are intended to be general in nature and provide a creditor with a pathway to communicate with its debtor without violating the stay, this Court finds that this particular disclaimer is not drafted in a way sufficient to overcome the overall tone and effect of the threats in the letter. The lack of transparency in the disclaimer's language is an apparent attempt to complicate and lessen its effect, thereby preserving the threatening nature of the letter even as to those it purports to exempt, essentially robbing it of a valid informational purpose. "Even if a communication has a valid informational purpose, it must be limited to that purpose to avoid violating the automatic stay." *Thomas,* 554 B.R. at 520. "This generally requires that the communication have at least one prominent and unambiguous disclaimer to that effect, and a lengthy communication should have multiple disclaimers." *Id.* "Moreover, the body of the communication should be limited to providing information; it should

not demand payment, nor have the overall effect of inviting or coercing payment." *Id.* In sum, Flagstar's December 17, 2014 letter to Debtor violates the stay under § 362(a) because it overtly demands payment, coerces its recipient to provide payment, and was not limited to a valid informational purpose. Therefore, the Court finds that Flagstar's Motion for Summary Judgment regarding Count I is due to be denied. Plaintiff has established that there is no genuine of material fact regarding the stay violation in Count I and is thus entitled to judgment as a matter of law thereto.

## Count II: RESPA Violations

Count II of Plaintiff's Second Amended Complaint is multi-faceted[4] with at least three alleged Real Estate Settlement Procedures ("RESPA") Act[5] violations: failure to comply with the noticing requirements set out in 12 C.F.R. § 1024.41(c), a dual tracking violation under § 1024.41(f) and failure to adequately respond to Plaintiff's Qualified Written Request and Notice of Servicing Error. The facts for each violation overlap or are intertwined for two of the claims, and the third claim, the Court finds has been abandoned. As to Count II, the Court finds as follows.

When a borrower finds himself in troubled waters on his mortgage, he may apply for a loss mitigation option with his mortgage holder or servicer. The servicer is not required to offer a loss mitigation program to the borrower. However, once a borrower applies for a loss

---

[4] Pleading each alleged violation in separate counts would have been helpful in adjudicating each alleged violation.

[5] "RESPA prescribes certain actions to be followed by entities or persons responsible for servicing federally related mortgage loans, including responding to borrower inquires." *Martinez v. Shellpoint Mortg. Servicing*, 2016 WL 6600437, at *3 (S.D. Fla. Nov. 8, 2016) (*citing McLean v. GMAC Mortg. Corp.*, 398 Fed. Appx. 467, 471 (11th Cir. 2010)). RESPA imposes liability for failure to comply with its provisions in an amount equal to the sum of "any actual damages to the borrower as a result of the failure[.]" 12 U.S.C. § 2605(f)(1)(A). A borrower may also recover statutory damages in the amount of $2,000 if there is a pattern or practice of noncompliance with RESPA. 12 U.S.C. § 2605(f)(1)(B).

mitigation option, the servicer is required to comply with certain rules and regulations in responding to a borrower's request for mitigation. Those rules and regulations were promulgated by the Consumer Financial Protection Bureau ("CFPB") and can be found in the Code of Federal Regulations ("CFR"). In implementing these regulations, the CFPB found that substantial and direct harm resulted from allowing a servicer to proceed to foreclosure while a modification request is pending. The portion of the CFR relevant to RESPA and the instant case is 12 C.F.R. 1024.41, also known as Regulation X ("Reg. X"). The Court will analyze each CFR violation in chronological order as they occurred, beginning with the noticing requirement violations.

<u>Violation of the Noticing Requirements</u>

Under Reg. X, once a loss mitigation application is complete, the servicer must, within thirty days, evaluate the borrower for all mitigation options available to him and must notify the borrower in writing which loss mitigation option(s) will be offered; the amount of time the borrower has to accept or reject the offer of mitigation; and must also inform the borrower of his right to appeal the denial of any option and the amount of time within which he must do so. § 1024.41(c)(1)(i)-(ii). Additionally, if a borrower's complete loss mitigation application is denied, the servicer must also include in that thirty-day notice the reasons why the servicer denied the application. § 1024.41(d).

Here, the Court finds that Flagstar violated § 1024.41 subsections (c) and (d). On May 21, 2014, Flagstar sent Mr. Jackson a letter indicating that his application for loss mitigation was complete and that Flagstar may take up to thirty days to evaluate the complete application. (Doc. 56-5). The letter also stated that Flagstar would send a notice in writing of its determination of Mr. Jackson's eligibility and offer for loss mitigation, if available. The letter also promised that

foreclosure would not occur without Flagstar actually evaluating the application, sending written notice to Jackson of the evaluation and a chance for Jackson to respond to the evaluation.

In mid-June, Mr. Jackson called Flagstar to check on his modification request and was told it was still in review and to allow more time for the process to be completed. (Doc. 56-2 at 5). Mr. Jackson was also told to call back periodically to check on the status of the application, which he did. Each time he called, he was informed that he was eligible for the loan modification, but that it was still under review. (Doc. 56-1 at 7, 11-13, 15).

In the meantime, Flagstar sent Mr. Jackson a series of five letters stating that his loan was in default, and offered a "repayment" agreement to bring the loan current. (Doc. 56-6). Flagstar refers to each of these letters as a forbearance plan which was offered to Plaintiff to avoid potential foreclosure. Flagstar contends that by sending these forbearance plan letters to Mr. Jackson it complied "plain and simple" with § 1024.41 by notifying Mr. Jackson which loss mitigation options, if any, it will offer to him. (Doc. 57 at 13). However, this Court finds such characterization of these letters disingenuous, as they clearly do not comply with the noticing requirements of § 1024.41(c).

These five letters did not approve or deny, or in any way address the pending loan modification application, nor did they modify the terms of the loan. They likewise fail to address any right to appeal. Instead, the letters provided that Mr. Jackson could add $1,478.29 to his regular monthly payment for the next six months to bring the loan current. Mr. Jackson was already struggling with his regular monthly payment of $494.56, and adding $1,478.29 would make his total monthly payment $1,972.85. For Mr. Jackson, the monthly payments offered in these letters were too large for him to make each month, especially when he was told he was eligible for a permanent loan modification. (Doc. 56-1 at 8). Holding out for the permanent loan

modification, Mr. Jackson did not attempt to make these higher payments. He did, however, attempt to send his regular $494.56 monthly payment, but Flagstar rejected those payments causing the loan to accrue additional arrears each month. The last of these five letters was sent on July 7, 2014. (Doc. 56-6 at 10).

By August of 2014, Mr. Jackson was still in limbo, waiting for a decision on his modification request, but relying on Flagstar's May 21, 2014 letter promising that foreclosure would not occur until he was notified of a resolution on his loss mitigation request. However, Flagstar's foreclosure department referred the loan to its outside foreclosure counsel, and on August 29, 2014, Flagstar received an assignment of the mortgage. On September 15, 2014, Flagstar accelerated the debt and published in Jackson's hometown newspaper a foreclosure notice for a sale scheduled for December 10, 2014. (Doc. 56-8). On October 31, 2014, Mr. Jackson filed for bankruptcy protection to stall the foreclosure and attempt to keep his home. At no point between the completion of Mr. Jackson's loan modification application on May 21, 2014, and the publication of the notice of foreclosure sale on September 15, 2014, did Flagstar provide Plaintiff with any written notice that his loan modification application was denied or otherwise resolved.

To recap, § 1024.41(c)-(d) requires Flagstar to notify Mr. Jackson of its resolution of his loan modification application. That notification must include whether the application was approved or denied, the amount of time Mr. Jackson had to accept or reject the offer if one was given, and must inform Mr. Jackson of his right to and time within which to appeal, if his application was denied. Flagstar acknowledged these duties by way of its May 21, 2014 letter.

Flagstar admits that it never sent any written notification to Mr. Jackson that his application for a permanent loan modification was denied, (Doc. 56-2 at 6), thereby placing it in

violation of § 1024.41(c) and (d).  Consequently, despite sending a loss mitigation offer in the form of a forbearance plan, Flagstar also failed to notify Mr. Jackson of his right to and time within which to appeal the denial, as well as the reasons his application was denied.  Therefore, this Court finds that no genuine issue of material fact exists as to Flagstar's violation of § 1024.41(c) and (d).  Flagstar's Motion for Summary Judgment is therefore denied as to those allegations in Count II of Plaintiff's Second Amended Complaint; and Plaintiff's Motion for Summary Judgment on this portion of his Count II is granted.

## Dual Tracking

In addition to violating the noticing requirements set out above, Plaintiff contends that Flagstar also violated the prohibition on foreclosure referral provision of § 1024.41(f), also known as "dual tracking."  This Court agrees.

> Subsection (f) states:
>> a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless: (i) [t]he servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process . . . of this section is not applicable, that the borrower has not requested an appeal within the applicable time period for requesting an appeal or the borrower's appeal has been denied; (ii) [t]he borrower rejects all loss mitigation options offered by the servicer; or (iii) [t]he borrower fails to perform under an agreement on a loss mitigation option.

§ 1024.41(f)(2).

No special interpretation is necessary here.  The prohibition against dual tracking is simple and unambiguous.  The use of the words, "shall not" means that the servicer is expressly prohibited from engaging in the conduct proscribed unless one of three exceptions is present.  Here, Flagstar engaged in the proscribed conduct, and none of the three exceptions were present.

The first exception permits foreclosure only if the servicer has complied with the noticing requirements of § 1024.41(c)(1)(i).  This Court already found Flagstar to be in violation of these

noticing requirements above, and finds that no additional or different analysis on that violation is necessary here. Where notice is not properly given under subsection (c), and a servicer proceeds toward foreclosure anyway—that is a direct violation of subsection (f) and that is exactly what happened here.

Regarding the two remaining exceptions of (ii) borrower rejection and (iii) borrower's failure to perform under a loss mitigation agreement, the facts as presented show that neither of those exceptions are relevant or present either. Therefore, the Court finds there is no genuine issue of material fact as to the dual tracking violations raised in Count II of Plaintiff's Second Amended Complaint. As such, Flagstar's Motion for Summary Judgment on this claim is denied, and summary judgment on the same is due in Plaintiff's favor.

<u>QWR and NOE; Remaining Causes of Action</u>

Count II of Plaintiff's Second Amended Complaint states other RESPA claims stemming from Flagstar's alleged failure to respond to Plaintiff's post-bankruptcy May 22, 2015 QWR and NOE. The Second Amended Complaint also states claims for five other causes of action: fraud and fraudulent suppression, Fair Debt Collection Practices Act violations, breach of mortgage agreement, negligence and wantonness. (Doc. 31). Plaintiff's Motion for Summary Judgment does not address QWR or NOE, nor the remaining causes of action set out in the Second Amended Complaint. (Doc. 56). As such, this Court deems the remaining five causes of action as well as the QWR/NOE alleged violations in Count II abandoned. *See Moore v. Seterus, Inc.*, 2016 WL 7374651, at *13 (S.D. Ala. Dec. 16, 2016)(*citing Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned")).

CONCLUSION

For the reasons stated herein, this Court finds that Flagstar has failed to prove that it is entitled to judgment as a matter of law as to the stay violation raised in Count I, and the noticing and dual tracking violations raised in Count II. Flagstar's Motion for Summary Judgment as to those claims is therefore DENIED. The Court finds that Plaintiff has proven that he is entitled to judgment as a matter of law as to the stay violation, as well as the noticing and dual tracking violations raised in Counts I and II of his Second Amended Complaint. Therefore, Summary Judgment is due to be and hereby is GRANTED as to those claims. This case is hereby set for status on April 11, 2017, at 10:30 a.m. in Courtroom One before the undersigned. Prior to the status hearing, counsel for the parties are ORDERED to confer regarding available dates for the hearing on damages.

Dated: March 23, 2017

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE